IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 08-44 |
| | : | |
| MARK GREEN | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                           May 16, 2011

On November 4, 2009, Defendant Mark Green was convicted of one count of conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1029(b)(2) (Count I); two counts of unauthorized use of an access device, in violation of 18 U.S.C. § 1029(a)(2) (Counts II and III); and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (Count V).[1] Green asks this Court to arrest judgment on his convictions, dismiss his Indictment, enter a judgment of acquittal, or grant him a new trial. For the following reasons, Green's omnibus motion is denied.

**FACTS**

From January to June of 2007, Green obtained stolen personal identification information for two individuals, Keith Berthrong and Frank Monzo. He used the information to apply for credit cards and create identification documents in the names of the two men, and then used the fraudulently obtained credit cards to purchase goods and services in Pennsylvania, New Jersey, and Delaware.

Green's illegal activity was uncovered during a joint investigation by the Secret Service and the Upper Dublin Township Police Department. While investigating Green, Secret Service Agent

---

[1] The jury acquitted Green Count IV of the Indictment, in which he was charged with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).

Sabrina Cipriano received notice from U.S. Postal Inspector Brian Shannon that the name Frank Monzo had become related to an address which Cipriano believed Green was using. Cipriano contacted Monzo to see if he had been the victim of identity theft, and he told her approximately $400,000 of fraudulent charges had been incurred under his name.

By researching the fraudulent purchases made in Monzo's name, Agent Cipriano and Upper Dublin Township Police Detective Daniel Wade discovered that Green had used credit cards in Monzo's name to pay for repairs made to a Mercedes Benz in Fort Washington, Pennsylvania. Their investigation revealed that Green dropped off the car and told repair shop employees it belonged to his company, Lotus Dotson Auto Sales.[2] The total cost of the repair work was $12,002.35. While the car was undergoing repairs, two individuals came to the repair shop on three separate occasions to make installment payments for the repairs. A Discover card in the name of Keith Berthrong was charged $2,500 on one occasion and $4,000 on another, and a Macy's VISA card in the name of Frank Monzo was charged $2,500. These payments were made at Green's direction by two individuals who acted as Green's employees, Josephine Breslin and Green's co-defendant Linwood Scott.[3] When Breslin and Scott were interviewed by police, they said Green provided them with the credit cards and paid them to make the payments at the repair shop.

After discovering that fraudulent credit cards were being used to pay for the car repairs, Detective Wade obtained a search warrant for the Mercedes Benz. Upon searching Green's car, he found, *inter alia*, (1) a photocopy of an envelope addressed to Frank Monzo, (2) a Bank of America account statement addressed to Monzo, (3) a tax payment form with Monzo's name on it, (4) a

---

[2] A later search of the VIN on the car revealed the car was registered in Green's name.

[3] Although Scott was indicted with Green he has not yet been tried because he is a fugitive.

W.S.S. Bank checking account statement in Monzo's name, and (5) a number of insurance documents for the Mercedes addressed to Green.

At the same time Agent Cipriano and Detective Wade were investigating Green, he was involved in an identity fraud investigation conducted by Pennsylvania State Police Trooper David Shearn, a vehicle fraud investigator. Shearn's investigation involved a man named Tracy Lamont Green, who resided at 1979 Renovo Street, one of several addresses associated with Mark Green. When Shearn submitted a photograph of Tracy Lamont Green to PennDOT, the agency used its facial recognition software to determine Tracy Lamont Green was in fact the Defendant, Mark Green.

Having discovered that he was under investigation, Green contacted federal law enforcement agents on November 16, 2007, and said he wished to speak to them. Green thereafter voluntarily appeared at the Upper Dublin Township Police Department for an interview. Before he arrived, Green was advised he would be arrested after he made his statement because he had an open arrest warrant in Upper Dublin for criminal charges related to this matter. Green knowingly waived his Miranda rights before speaking to police. In addition to Detective Wade, Agent Cipriano, and Inspector Shannon, Green met with the Assistant United States Attorney investigating his case and FBI Agent Bob Loughney.

During the interview, Green admitted to the above conduct and provided additional information about how he accomplished his crimes. Green said he was "the boss" of an identity theft scheme and explained that he directed the actions of four different people who obtained identity information and used fraudulently obtained credit cards to make purchases. Trial Tr. II, Nov. 3, 2009, 145. Green explained that one member of his conspiracy, Eric Williams, would steal personal

identifying information from mailboxes, cars, purses, and wallets. After Williams obtained driver's licenses, credit cards, and mail from his victims, he would provide the information he gleaned from these documents to Green, who would then apply for credit cards in these individuals' names. Green also admitted he gave credit cards issued in the names of Berthrong and Monzo to Breslin and Scott, and paid Breslin and Scott to use such cards to pay for repairs to his Mercedes Benz. Green told the interviewers he had also used the credit card in Monzo's name to purchase a Corvette, a Chevrolet SUV, and a Land Rover. At the time of his interview, Green told law enforcement personnel he no longer had the phony credit cards or any phony identification cards because he had thrown them into a dumpster at a Philadelphia construction site. When police searched an apartment affiliated with Green, however, they recovered a Macy's card and two fraudulent driver's licenses in Monzo's name.[4]

On January 24, 2008, a federal grand jury indicted Green on the charges described above. On November 4, 2009, after a three-day trial, a jury returned guilty verdicts on Counts I, II, III, and V.

**DISCUSSION**

Green first seeks an arrest of judgment on his convictions pursuant to Federal Rule of Criminal Procedure 34(a), which requires a court to arrest judgment if the court does not have jurisdiction of the charged offense." Green contends this Court lacked jurisdiction over his Indictment because Counts I, IV, and V failed to state that the conspiracy he engaged in or his possession of fraudulent credit cards affected interstate commerce. Green relies on *United States*

---

[4] The driver's licenses showed Monzo's name and some identifying details, but had a picture of Green on them.

*v. Spinner*, 180 F.3d 514 (3d Cir. 1999), which he contends stands for the proposition that "[w]hen any count of an indictment fails to charge an [effect] on interstate or foreign commerce as an element of the offense, the Court lacks jurisdiction over the entire indictment." Def.'s Post-Verdict Mot. 1.

The Indictment sets forth the offenses with which Green is charged in language mirroring the words of the criminal statutes. The access device fraud statute referenced in Counts II and III provides, in relevant part, "Whoever . . . (2) knowingly and with intent to defraud traffics in or uses one or more unauthorized access devises during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period; . . . shall, if the offense affects interstate or foreign commerce, be punished . . . ." § 1029(a)(2). Thus, Counts II and III, which charge Green with unauthorized use of an access device, include a statement that Green's actions affected interstate and foreign commerce. Because the statutes referenced in Counts I, IV, and V do not mention interstate commerce, however, those counts do not include such an express jurisdictional statement.

To confer federal jurisdiction, "the interstate commerce element of the crime with which [the defendant] is charged must be alleged in the indictment." *Spinner*, 180 F.3d at 515. In *Spinner*, the defendant was charged with access device fraud, in violation of 18 U.S.C. § 1029(a)(5), and bank fraud, in violation of 18 U.S.C. § 1344. *Id.* Although the Government included the federal jurisdictional element in the second count of the indictment, pertaining to bank fraud, it failed to allege that any of the access device fraud transactions in the first count affected interstate or foreign commerce. *Id.* The Government asserted such an omission was harmless error which was cured by inclusion of the federal jurisdictional element in the second count. The Third Circuit disagreed, finding the failure to state the elements of an offense was a "fundamental defect" and stating "[t]he

fact that the United States charged interference with interstate commerce in [another count] of [the defendant's] indictment is not a sufficient basis on which to find federal jurisdiction." *Id.* at 516. The Third Circuit held that because the indictment did not allege an effect on interstate commerce for the access device fraud charge, it was jurisdictionally defective. *Id.* at 516.

The instant case is distinguishable from *Spinner* because, in that case, the Government failed to include language regarding the effect on interstate or foreign commerce in the access device fraud charge, an offense which specifically requires such an effect. Here, in contrast, the Government included language regarding an effect on interstate commerce in the access device fraud counts (Counts II and III), the only counts of the Indictment which required an effect on interstate commerce to be separately alleged. While the Government did not include such language in the remaining counts (Counts I, IV, and V), unlike in *Spinner*, those counts do not require a separate express jurisdictional statements.

Count IV and V, which charge Green with aggravated identity theft, do not require an effect on interstate commerce because aggravated identity theft is a crime which serves as a sentencing enhancement to a predicate offense affecting interstate commerce (in this case, access device fraud). *See* 18 U.S.C. § 1028A(a)(2) ("Whoever, during and in relation to any felony [including a violation of § 1029 ] knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.").

The same is true of Count I, in which Green is charged with access device fraud conspiracy, an offense which is based on the underlying act or attempt of access device fraud. *See* 18 U.S.C. § 1029(b)(2) ("Whoever is a party to a conspiracy of two or more persons to commit an offense

under subsection (a) of this section, if any of the parties engages in any conduct in furtherance of such offense, shall be fined . . . or imprisoned . . . or both."). Because the Government referred to § 1029(a)(2) in Count I, and then listed all the elements for a § 1029(a)(2) violation in Counts II and III, the jurisdictional element of the latter counts was incorporated by reference into the former. *See United States v. Dixon*, 308 F.3d 229, 231 n.1 (3d Cir. 2002) (explaining that because § 1029(b)(2) criminalizes conspiracy to commit a violation of § 1029(a)(2), the conspiracy statute "incorporates substantive elements of § 1029(a)"). Thus, for Counts I, IV, and V, the Indictment set forth all the elements necessary to constitute the offenses charged.[5] Therefore, this Court finds its exercise of jurisdiction was proper and will deny Green's motion for an arrest of judgment on his convictions.

Green next asks this Court to dismiss his Indictment due to alleged prosecutorial misconduct before the Grand Jury. Green contends the Assistant United States Attorney made various improper and prejudicial statements during the grand jury proceedings.[6] This argument is mooted, however, by the jury's finding of guilt beyond a reasonable doubt at trial. *See United States v. Mechanik*, 475 U.S. 66, 70 (1986) (explaining a subsequent guilty verdict reveals there was probable cause at the

---

[5] Additionally, this Court instructed the jury that interstate or foreign commerce was a necessary element of all of the counts of the Indictment, and told the jury that Green's conduct must have "affected in some way, trade or other - - or business or travel - - between two or more states or between a state and a foreign country. The Government must prove that Mr. Green's conduct had some effect on commerce, no matter how minimal or slight." With regard to Counts Four and Five, which charged Green with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), the Court reminded the jury that it must first find that the Government proved the elements for Counts Two and Three for access device fraud as previously described.

[6] Green alleges the prosecutor's prejudicial statements included: (1) telling the Grand Jury Green had "a large number of aliases" before listing eight aliases; (2) giving the impression the Government had additional inculpating facts about Green's conduct, but that time constraints prevented their presentation to the Grand Jury; (3) telling the Grand Jury Green had purchased his Mercedes-Benz through fraudulently obtained credit cards; and (4) failing to offer evidence that his conduct affected interstate or foreign commerce.

grand jury stage to believe the defendant was guilty and renders "any error in the grand jury proceeding connected with the charging decision [] harmless beyond a reasonable doubt"); *United States v. Console*, 13 F.3d 641, 672 (3d Cir. 1993) ("The petit jury's guilty verdict rendered any prosecutorial misconduct before the indicting grand jury harmless."). Therefore, the Court will deny Green's motion to dismiss the indictment on the basis of alleged prosecutorial misconduct before the Grand Jury.

Green also asks this Court to dismiss his Indictment due to violations of the Speedy Trial Act, 18 U.S.C. § 3161. The Speedy Trial Act mandates that the trial of a defendant charged in an indictment must commence "within seventy days from the filing date (and making public) of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). Time can be excluded under the Speedy Trial Act for a number of reasons. Green appeared before a Magistrate Judge of this Court on December 26, 2007, the date of his arrest. The Indictment was filed on January 24, 2008. Thus, Green's speedy trial "clock" began to run on January 24, 2008. Green was in custody for 648 days before his trial commenced. Less than 70 days of this time, however, is counted for purposes of the Speedy Trial Act, while the remainder of the time falls within the Speedy Trial Act time exclusions enumerated in § 3161(h).

Fifty-four days passed between the Indictment and the parties' first joint motion for a continuance of the March 25, 2008, trial date, which was filed on March 18, 2008. This Court granted the motion on March 20, 2008, and 96 excludable days passed before Green filed an unopposed motion for a further trial continuance. *See* § 3161(h)(7)(A) (excluding "[a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the

defendant or his counsel or at the request of the attorney for the Government"). Such time is excludable provided it was granted "on the basis of [the judge's] finding that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* In the March 20, 2008, Order, this Court stated the continuance was granted because the Government and Green advised they were engaged in discussions which may result in a non-trial disposition of the case. The ends of justice are served by giving a defendant time to consider the costs and benefits of pleading guilty. *See United States v. Fields*, 39 F.3d 439, 445 (3d Cir. 1994) (explaining that, because plea negotiations play a vital role in federal criminal practice, an "ends of justice" continuance may be granted to permit plea negotiations to continue).

On June 23, 2008, Green filed an unopposed motion to further continue the trial date, which this Court granted on June 26, 2008, based on defense counsel's assertion he needed additional time to prepare for trial.[7] The period following this Order is also excluded pursuant to § 3161(h)(7)(A). On February 27, 2009, 196 days after this Court granted Green's motion for a continuance, Green's counsel filed a motion to withdraw. Although the Speedy Trial clock was already tolled due to counsel's continuance request, defense counsel's motion to withdraw, and the disposition of such motion, are also excluded. *See* § 3161(h)(1)(D) (excluding "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion"). Following a March 9, 2009, hearing in which this Court discussed defense

---

[7] Green asserts, despite his counsel's continuance requests, he consistently requested to be tried in a timely manner, and he argues the Court should have honored his requests, while ignoring those of his attorney. Green's argument, however, is unpersuasive. "Assigned counsel, just as retained counsel, act on behalf of their clients, and delays sought by counsel are ordinarily attributable to the defendants they represent." *Vermont v. Brillon*, 129 S. Ct. 1283, 1287 (2009). Moreover, any delay which may even be arguably attributable to the failure of assigned counsel to move the case forward is not delay attributable to the Government under the Speedy Trial Act. *Id.* at 1291.

9

counsel's motion with Green and his attorney, and in which Green stated he no longer wished to have his attorney removed, this Court denied defense counsel's motion as moot on April 21, 2009.

Between April 21, 2009, to July 17, 2009, Green, his attorney, and the Assistant United States Attorney, endeavored to work on a non-trial disposition of this case.[8] On July 17, 2009, having received no notice of a negotiated plea agreement, and following a July 15, 2009, teleconference in which this Court discussed scheduling with the Government and defense counsel, this Court scheduled the case for trial on October 26, 2009. Although Green's trial date was set for the last week of October 2009, the Government understood, through conversations with Green and his attorney, that Green intended to plead guilty. On the eve of trial, however, Green changed his mind, leaving the Government unprepared for trial because a key witness was unavailable. This Court granted the Government a one-week continuance of the trial date, to November 2, 2009, to secure the presence of the witness. This one-week delay is also excluded from the Speedy Trial Act calculation. *See* 18 U.S.C. § 3161(h)(3)(A) (excluding "[a]ny period of delay resulting from the absence or unavailability of the defendant or an essential witness").

The timeline for this case demonstrates that 63 nonexcludable days elapsed between the filing of the Indictment and Green's trial. Because there was no Speedy Trial Act violation, Green's motion to dismiss his Indictment on that basis is denied.

Green next seeks a judgment of acquittal, arguing the evidence introduced at trial was insufficient to prove beyond a reasonable doubt that he obtained anything of $1,000 or more in value by using unauthorized access devices. He contends that, although he directed the payment of $9,000

---

[8] Green also filed another motion for pre-trial release during this period, which was denied on July 27, 2009.

for repairs to his Mercedes using fraudulent credit cards, no evidence was introduced at trial showing the repairs were actually completed or that Green obtained the value of such repairs. In reviewing a challenge to the sufficiency of evidence, this Court views the evidence in the light most favorable to the Government and will sustain the jury's verdict if a reasonable jury could find guilt beyond a reasonable doubt. *United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010). As part of this review, a court must "examine the totality of the evidence, both direct and circumstantial," *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009) (citation omitted), but must not consider witness credibility or weigh the evidence, *United States v. Jones*, 566 F.3d 353, 361 (3d Cir. 2009).

At trial, a representative from the Mercedes-Benz repair shop testified that, because Green requested a large repair job, a prepayment of $9,000 was required to repair the car. Detective Wade testified he reviewed receipts for the prepayment, which revealed that credit cards which Green fraudulently obtained were used on three instance to make payments toward the repairs, totaling $9,000. The remaining balance of $3,000 was paid in cash. Testimony was also introduced which revealed some of the scheduled repairs to the vehicle had been completed at the time of the payments. Although Green argues these repair costs should not be included because no evidence was introduced showing he picked up the car, there is no requirement in the statute that Green actually take possession of the car. Moreover, he indisputably received a benefit by charging $9,000 on fraudulently obtained credit cards, because without this prepayment the repair shop would not have done work on his car. Just as credit card "loss" under § 1029(a) is measured at the moment the credit cards are charged, *see United States v. Goldstein*, 442 F.3d 777, 784 (2d Cir. 2006), so, too, is a benefit incurred at the moment a merchant demands payment and a defendant uses an unauthorized access device to make such payment. Furthermore, evidence was introduced at trial

11

that Green told authorities he purchased three automobiles under Monzo's name, and this evidence was corroborated by Monzo's testimony that more than $400,000 worth of fraudulent purchases had been made under his name. Given these facts, a reasonable jury could easily find Green obtained something of value worth more than $1,000.

Green also moves for a judgment of acquittal, arguing the proof at trial varied materially from the charges in the Indictment, insofar as the Indictment identified only $9,000 in value obtained from Green's use of unauthorized access devices, but the Government attempted to prove $400,000 in value obtained at trial. "[A] conviction must be vacated and the indictment dismissed when (1) there was at trial a variance between the indictment and the proof and (2) the variance prejudices a substantial right of the defendant." *United States v. Schurr*, 775 F.2d 549, 553 (3d Cir. 1985); *see also Burger v. United States*, 295 U.S. 78, 82 (1935) ("The true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused.").

The plain language of the Indictment, however, reveals that in both Counts II and III, the Indictment did not limit the loss amount of Green's fraudulent credit card use. Instead, Count II states Green used a fraudulently obtained Discover card "to obtain things of value aggregating $1,000 or more, . . . for a total of *at least* $6,500," and Count III states Green used a fraudulently obtained VISA card "to obtain things of value aggregating $1,000 or more, . . . for a total of *at least* $2,500." Indictment 4-5 (emphasis added). Moreover, the amount of value Green obtained through his fraud does not change the essential elements of any of the offenses, as long as the evidence showed the value he obtained was at least $1,000. *See United States v. Miller*, 471 U.S. 130, 136 (1985) (explaining convictions are generally sustained as long as "the proof upon which they are

based corresponds to an offense that was clearly set out in the indictment"). The proof the Government introduced at trial corresponds to the charges in Green's Indictment, and evidence he caused a greater loss than that listed in the Indictment is an issue for sentencing, not trial. *See United States v. Jenkins*, 333 F.3d 151 (3d Cir. 2003) (explaining a drug quantity need not be charged in the indictment or proved to the jury as long as such quantity does not increase a defendant's sentence beyond the statutory maximum); *United States v. Lewis*, 113 F.3d 487, 493 (3d Cir. 1997) (holding an indictment that failed to identify the controlled substance at issue for a drug distribution charge was not insufficient because the identity of the controlled substance is a factor for sentencing, and not an element of the offense). Additionally, the interview Green gave to police belies his argument that he had insufficient notice of the amount of loss attributed to him. In his interview, he told police he used Monzo's identity to purchase at least three vehicles, showing he was on notice that the Government, in making its case, might introduce evidence of fraud loss exceeding the amount listed in the Indictment.

Green next asks this Court to order a new trial based on alleged violations of his Sixth Amendment right to confront the witnesses against him. He first argues his Sixth Amendment confrontation right was violated when this Court denied his request to conduct a second cross-examination of Detective Wade. Green states, because the prosecutor elicited no testimony from Wade on direct examination regarding Green's statement to the police, Green did not cross-examine Wade on his statement. On redirect, however, Green asserts the prosecutor elicited testimony about Green's statement, and argues he should have been permitted to recross on the basis of the new information disclosed on redirect. "As a general rule, a trial court has wide discretion to restrict recross examination, especially when no new matters have been raised on redirect." *United States*

13

*v. Riggi*, 951 F.2d 1368, 1374 (3d Cir. 1991). In accordance with this rule, this Court advised Green his right to recross examination was not absolute and he would only be entitled to recross a witness if the Government discussed something on redirect that he had not been able to raise on cross examination.

During his cross examination of Detective Wade, Green elicited testimony that Wade was present throughout Green's two-hour interview with police, but did not take any notes, only asked two questions, and did not remember specific questions posed by other law enforcement officials at the interview. On redirect, the prosecutor asked follow-up questions regarding Detective Wade's memory of the interview. Such questioning was in response to Green's efforts during cross examination to call into question Detective Wade's memory of Green's statements, and it responded directly to Green's suggestion on cross that Wade's testimony was unreliable. Because no new evidence was introduced on redirect, Green was not entitled to recross Wade. Moreover, Green did not object during trial that redirect questions were beyond the scope of cross. Therefore, Green's Sixth Amendment confrontation right was not violated by this Court's denial of his request to recross Wade.

Green also argues his right of confrontation was violated when the prosecutor informed the jury that Government agents who were present at Green's interrogation but did not testify at trial would have given inculpatory evidence. In his closing, Green challenged the Government's decision not to call every person who was present at his interrogation and told the jury it should question why the Government made that choice. In response, in her rebuttal remarks, the prosecutor said,

> [Green] talked about, well, Postal Inspector Shannon has been here the whole time, he has. He talked about [] FBI Agent Loughney, how come the Government did not bring him? Well, I suppose the Government could have presented everybody who

14

> was there at that meeting to say–testify–over and over and over again to the same thing that Agent Cipriano said and we could be here, until maybe, Friday.

Tr. II 97. Although the prosecutor should not have implied in her rebuttal remarks that if other witnesses were called, they would also have inculpated Green, this error does not require reversal. In determining whether a prosecutor's objectionable comments require reversal, a court "consider[s] the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction." *United States v. Helbling*, 209 F.3d 226, 241 (3d Cir. 2000) (internal quotations and citations omitted).

Here, the evidence against Green was very strong. The Government introduced evidence showing how two separate investigations into credit card fraud had led to Green. While pursuing these investigations, law enforcement officials obtained a detailed confession from Green and recovered mail addressed to Monzo, a credit card and driver's license in Monzo's name, and other inculpatory evidence in Green's car and apartment. The scope of the comments to which Green objects were rebuttal remarks in closing and were a minor part of the trial in relation to the entire proceeding. Given the overwhelming evidence against Green, it is unlikely this statement caused the jury to change its mind or to convict Green rather than acquit him. *See United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (explaining a conviction should not be reversed when, "by definition, the conviction would have been obtained notwithstanding the asserted error" (quoting *United States v. Hasting*, 461 U.S. 499, 506 (1983))). Moreover, this Court instructed the jury that, in making its determination, it should consider only the evidence introduced at trial and should not

view the arguments of Green or the prosecutor as evidence.[9] Because these rebuttal statements do not require reversal, Green's motion will be denied on this ground.

Green also argues his Sixth Amendment right to self-representation was violated when he was excluded from sidebar conferences with the Court. Exclusion from a sidebar conference "does not automatically constitute a Sixth Amendment violation." *United States v. Schwartz*, 315 F. App'x 412, 416 n.1 (3d Cir. 2009) (citing *United States v. Mills*, 895 F.2d 897, 904-05 (2d Cir. 1990)). Instead, "the exclusion must be viewed 'in the context of the trial as a whole.'" *Id.* Here, Green was actively involved in the trial. He delivered opening and closing statements, and was permitted to cross examine witnesses. Before trial, this Court advised Green that, if he wished to proceed pro se, he would not have the same liberties as an attorney because, as an inmate, he would not be free to walk around the courtroom unless he was escorted by court security personnel. A criminal defendant's right to represent himself extends only insofar as he is "able and willing to abide by rules of procedure and courtroom protocol." *Id.* at 416 (citing *Faretta v. Cal.*, 422 U.S. 806, 834 (1975)); *see also Martinez v. Court of Appeal*, 528 U.S. 152, 162 (2000) (explaining that "standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long

---

[9] Furthermore, the prosecutor's statements likely fall under the "invited error" doctrine, which "teaches that where a prosecutorial argument has been made in reasonable response to improper attacks by defense counsel, the unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial." *See United States v. Gambone*, 314 F.3d 163, 179 n.11 (3d Cir. 2003) (citing *United States v. Pungitore*, 910 F.2d 1084, 1126 (3d Cir. 1990)). Green suggested the case against him was flawed because of the Government's decision not to call all individuals who were present at his interview as witnesses. There is no requirement, however, that all possible witnesses or evidence be presented by the Government, and "ordinarily no inference can be drawn from the failure to present all witnesses or evidence." Third Cir. Model Jury Instructions 3.05 cmt. Green's statement to the contrary, in which he suggested a negative inference should be drawn from the Government's failure to call all individuals present, was therefore improper, and the prosecutor's response in rebuttal to this statement was reasonable.

as that participation does not 'seriously undermine' the 'appearance before the jury' that the defendant is representing himself"). At trial, Green's stand-by counsel attended side bar conferences on his behalf, and ably represented Green's interests, but did not detract from the impression that Green was acting on his own behalf. Moreover, had Green been permitted to attend sidebar conferences, it would have likely prejudiced him because, when accompanied by court security officers, the jury would have realized Green was in custody, a fact which Green endeavored to conceal throughout trial.

Green next argues he should be granted a new trial because the Court erred in admitting into evidence statements he made when he met with police on November 16, 2007. Green contends his waiver of his right to counsel should be presumed involuntary because, at the time he interviewed Green, Detective Wade knew Green was represented by counsel. The circumstances surrounding the November 16, 2007, interview of Green do not support this assertion. Prior to the interview, Green contacted the Upper Dublin Township Police Department and federal law enforcement officers and expressed his belief that he was being investigated. Green said he was represented by Attorney James Gross, and both Township Police Department and the United States Attorney's Office contacted Gross. Gross, however, advised the United States Attorney's Office that he represented Green exclusively on a matter pending before the Philadelphia County Court of Common Pleas, and stated he had not been contacted by Green with regard to the matter under investigation in this case. Thus, despite his assertion to the contrary, Green was not represented by counsel in connection with the instant offenses at the time of his interrogation.

Additionally, a defendant may waive his right to counsel, so long as the waiver is voluntary, knowing, and intelligent. *Patterson v. Illinois*, 487 U.S. 285, 292 (1988). Green previously moved

to suppress his statements from the November 16, 2007, meeting, but testimony from the suppression hearing revealed Green voluntarily spoke with law enforcement officers. Before he went to the police station, Green was advised he would be arrested after he made his statement due to an outstanding warrant for his arrest. Once Green voluntarily traveled to the station, he was advised of his *Miranda* rights and signed a Waiver of Constitutional Rights form. This waiver was knowingly, intelligently, and voluntarily made, and this Court committed no error in permitting introduction of Green's statement at trial.

Finally, Green argues the Court failed to determine whether there was good cause to appoint replacement counsel when Green requested to proceed pro se. On the Friday before his Monday, November 2, 2011, trial date, Green informed the Court that he wished to represent himself at trial. "Because a request to dismiss counsel just before (or during) trial may well require a continuance," the Third Circuit has instructed district courts to "ascertain the defendant's reasons for his dissatisfaction with counsel." *United States v. Peppers*, 302 F.3d 120, 132 (3d Cir. 2002). "If there is good cause, the court is required to grant a continuance and appoint new counsel, unless the defendant expressly wishes to proceed pro se." *Id.*

In several ex parte hearings with Green and his counsel in the time before trial, the Court had become acquainted with Green's issues with his appointed counsel. Three days before trial, Green did not request appointment of new counsel, but strongly pressed his desire to proceed pro se. *See* Tr. 76-96, Oct. 30, 2010. Thereafter, this Court engaged in a lengthy colloquy with Green in which this Court "assure[d] itself that [Green] fully apprehend[ed] the nature of the charges against him, the perils of self-representation, and the requirements that [would] be placed upon him" at trial. *See Peppers*, 302 F.3d at 133 (outlining the steps a court must take to ensure the defendant's request to

proceed pro se is knowing and voluntary). This Court asked Green whether he had represented himself before, inquired into his familiarity with the Federal Rules of Evidence and Criminal Procedure, and strongly impressed upon him the risks and consequences of proceeding pro se.[10] Following this lengthy colloquy, this Court reserved ruling on Green's motion and instructed him to think carefully about his request over the weekend. On the morning of trial, Green restated his desire to proceed pro se and said he wished to be able to consult with his attorney as standby counsel. Then, throughout trial, Green received the benefit of being able to present his case in the way he deemed best while still receiving expert advice from a trained attorney who instructed him when to object and upon what grounds. Because Green's request to proceed pro se and waiver of his right to counsel were knowing, intelligent, and voluntary, there was no error in granting his request to represent himself.

For the foregoing reasons, Green's motion to arrest judgment of his convictions, motion to dismiss his indictment, motion for acquittal, and motion for a new trial are DENIED. An appropriate order follows.

---

[10] Additionally, during its colloquy into Green's request to proceed pro se, this Court asked Green why he felt he was better able to represent himself than his lawyer. Green said, "I can't say that I'm in a better position, because obviously, I'm in prison. He's in a better position from being outside. But I can [say] that I feel as though that I can - - ah - - present the case in the way that I think it should be presented, as [opposed] to the way he thinks it should be presented." Tr. 84-5, Oct. 30, 2010.